Case 4:22-cr-00083   Document 1   Filed on 02/14/22 in TXSD   Page 1 of 11

United States Courts
Southern District of Texas
FILED
*February 14, 2022*
Nathan Ochsner, Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, § § | |
| v. § § | Criminal No. **4:22-cr-83** |
| MARGARET ARISE § | |
| Defendant § | |

INFORMATION

**General Allegations**

1. The Medicare Program ("Medicare") was a federal healthcare program providing benefits to individuals who were over the age of 65 or disabled. Medicare was administered by the United States Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services ("CMS"). Individuals receiving benefits under Medicare were referred to as Medicare "beneficiaries."

2. Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

3. "Part A" of the Medicare program covered certain eligible home-healthcare costs for medical services provided by a home healthcare agency ("HHA") to beneficiaries requiring homehealth services because of an illness or disability causing them to be homebound. Payments for home-healthcare services were typically made directly to a HHA based on claims submitted to the Medicare program for qualifying services that had been provided to eligible beneficiaries, rather than to the beneficiaries.

4. Physicians, clinics, and other healthcare providers, including HHAs that provided services to Medicare beneficiaries, were able to apply for and obtain a Medicare "provider

number." A healthcare provider that was issued a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim was required to set forth, among other things, the beneficiary's name and Medicare identification number, the services that were performed for the beneficiary, the date the services were provided, the cost of the services, and the name and identification number of the physician or other healthcare provider that ordered the services.

5. The Medicare program paid for home-health services only if the patient qualified for home-healthcare benefits. A patient qualified for home-healthcare benefits only if:

    a. the patient was confined to the home, also referred to as homebound;

    b. the patient was under the care of a physician who specifically determined there was a need for home healthcare and established the Plan of Care (or "POC"); and

    c. the determining physician signed a certification statement specifying that:

        i. the beneficiary needed intermittent skilled nursing services, physical therapy, or speech therapy; ii. the beneficiary was confined to the home; iii. a POC for furnishing services was established and periodically reviewed; and iv. the services were furnished while the beneficiary was under the care of the physician who established the POC.

## HOME HEALTH CLINICS

6. **1st American Choice Home HealthCare Services LLC ("1st American")** was a purported home health company doing business at 2620 Tanglewilde Street, Suite 105, Houston,

Texas 77063. 1st American allegedly provided home health services in or around April 2014 through in or around October 2020.

7.     **Comforthome Health Care Inc. ("Comforthome")** was a purported home health company doing business at 8700 Commerce Park Drive, Suite 234, Houston, Texas 77036. Comforthome allegedly provided home health services from March 2013 through September 2017.

8.     **Unlimited Help Nursing Services Inc. ("Unlimited")** was a purported home health company doing business at 2620 Tanglewilde Street, Suite 103, Houston, Texas 77063. Unlimited allegedly provided home health services from August 2016 through June 2019.

9.     **Madonna Healthcare Services Inc. ("Madonna")** was a purported home health company doing business at 8700 Commerce Park Drive, Suite 216, Houston, Texas 77036. Madonna allegedly provided home health services from September 2015 through February 2018.

10.    **Bathfol Health Service Inc. ("Bathfol")** was a purported home health company doing business at 8700 Commerce Park Drive, Suite 234, Houston, Texas 77036. Bathfol allegedly provided home health services from September 2012 through February 2016.

11.    **Arisco Home Health Care ("Arisco")** was a purported home health company doing business at 120 South Main Street, Suite 316, Victoria, Texas 77901. Arisco allegedly provided home health services from in or around November 2012 through February 2016.

12.    **Compassionate Healthcare Services ("Compassionate")** was a purported home health company doing business at 2620 Tanglewilde Street, Suite 101, Houston, Texas 77063.

Compassionate allegedly provided home health services since in or around February 2014 through in or around October 2020.

13.    **Victorian Healthcare Services Inc. ("Victorian")** was a purported home health company doing business at 120 South Main Street, Suite 317, Victoria, Texas 77901. Victorian allegedly provided home health services in or around May 2006 through in or around October 2020.

14.    The above home health agencies will be collectively referred to as "Home Health Agencies."

## DEFENDANTS

15.    **MARGARET ARISE ("ARISE"),** a resident of Fort Bend County, Texas, owned and/or operated the above Home Health Agencies. **ARISE** was a registered nurse who directed, controlled and financially benefitted from the Home Health Agencies.

## CO-CONSPIRATORS

16.    Olakunle Omiyale ("Omiyale"), a resident of Fort Bend County, Texas, assisted with the day-to-day operations of the Home Health Agencies and is associated with **ARISE.**

17.    Dollars Aguh ("Aguh"), a resident of Harris County, Texas, assisted with the day-to-day operations of the Home Health Agencies and is associated with **ARISE.**

18.    Audu Abdul Azia Ozigi ("Ozigi"), a resident of Harris County, Texas, assisted with the day-to-day operations of the Home Health Agencies and is associated with **ARISE.**

19. Dr. Pedro Garcia: A physician licensed in the State of Texas, was paid illegal kickbacks by **ARISE** to sign Plan of Care Forms certifying home health for Medicare Beneficiaries who did not need home health and who were not under the care of the physician.

20. Dr. Eduardo Carrillo: A physician licensed in the State of Texas, was paid illegal kickbacks by **ARISE** to sign Plan of Care Forms certifying home health for Medicare Beneficiaries who did not need home health and who were not under the care of the physician.

## COUNT 1

### Conspiracy to Commit Healthcare Fraud
### (Violation of 18 U.S.C. § 371)

21. Paragraphs 1 through 20 are re-alleged and incorporated by reference as if fully set forth herein.

22. From in or around May 2006 to in or around October 2020, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas, and elsewhere, Defendants

### MARGARET ARISE

did knowingly and willfully combine, conspire, confederate and agree with others known and unknown to the grand jury, to violate Title 18, United States Code, Section 1347, that is, to execute a scheme and artifice to defraud a healthcare benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, said healthcare benefit program, in connection with the delivery of and payment for healthcare benefits, items and services.

## Purpose of the Conspiracy

It was a purpose of the conspiracy for Defendant **ARISE** and her co-conspirators and others known and unknown to the Grand Jury, to unlawfully enrich themselves by (a)Paying kickbacks for patient referrals and physician signatures on Medicare forms  (b)Submitting requests for anticipated payments and claims for home health services that were not medically necessary (c) causing the diversion of the proceeds of the fraud for the personal use and benefit of Defendants and their co-conspirators.

## Manner and Means of the Conspiracy

The manner and means by which defendants sought to accomplish the purpose of the conspiracy included, among other things:

1. Defendants **ARISE** and her co-conspirators, known and unknown, made it appear as if Medicare beneficiaries qualified for and received home-health services, when those services were not medically necessary, not provided or both.

2. Defendant **ARISE** did submit enrollment applications to Medicare under the name of the Home Health Agencies for the submission of claims for payment to Medicare.

3. Defendant **ARISE** obtained and thereafter maintained sole signature authority for Compassionate Bank of America Accounts ending in x1870, x2846, x0649, x2903, x8415, x9476.

4. Defendant **ARISE** obtained and thereafter maintained sole signature authority for 1st American Capital One Bank Accounts ending in x9884, x3739, x9729, x6968.

5. Defendant **ARISE** obtained and thereafter maintained sole signature authority for Bathfol Chase Bank Accounts ending in x5150, x6506 and x8250.

6. Defendant **ARISE** obtained and thereafter maintained sole signature authority for Comforthome Chase Bank accounts ending in x3465 and x6144.

7. Defendant **ARISE** obtained and thereafter maintained sole signature authority for Madonna Chase Bank accounts ending in x3818 and x2717.

8. Defendant **ARISE** obtained and thereafter maintained sole signature authority for Unlimited Wells Fargo Bank accounts ending in x1574, x1582, x1590, x2813, x2678, and x2751.

9. Defendant **ARISE** obtained and thereafter maintained sole signature authority for Arisco Wells Fargo Bank account ending in x7980.

10. Defendant **ARISE** financially benefitted from the Victorian Wells Fargo Bank accounts ending in x4169, x0541, and x3130. These accounts were under Segun B. Ogungbeni, Arise's son.

11. **ARISE** would and did pay marketers to sign up Medicare beneficiaries to receive home health services that were not medically necessary, not provided or both, from the Home Health Agencies.

12. From on or about May 2006 through October 2020, **ARISE** did agree to pay coconspirator physicians Garcia and Carrillo and other physicians known and unknown to the Grand Jury for physician signatures certifying home health for beneficiaries when such medical

services were not necessary. Specifically, ARISE made an agreement to pay coconspirator physicians by either cash or check.

13. Defendants **ARISE** and others known and unknown to the Grand Jury, paid a medical clinic involved in an undercover FBI operation, for Plan of Care Forms signed by a physician certifying home health for purported home-health services that were not medically necessary, not provided or both.

14. **ARISE** and others known and unknown to the Grand Jury did either forge signatures of physicians on Plan of Care Forms or pay other physicians to sign the forms, certifying home health for Medicare beneficiaries that were not medically necessary, not provided or both.

15. As a result of these fraudulent claims, Medicare made payments to 1st American in the approximate amount of $6,336,171 dollars. Those payments were deposited into 1st American's Captial One Bank accounts.

16. As a result of these fraudulent claims, Medicare made payments to Arisco in the approximate amount of $2,312,842 dollars. Those payments were deposited into Arisco's Wells Fargo Bank accounts.

17. As a result of these fraudulent claims, Medicare made payments to Bathfol in the approximate amount of $2,434,304 dollars. Those payments were deposited into Bathfol's Chase Bank accounts.

18. As a result of these fraudulent claims, Medicare made payments to Comforthome in the approximate amount of $2,017,780 dollars. Those payments were deposited into Comforthome's Chase Bank accounts.

19.  As a result of these fraudulent claims, Medicare made payments to Compassionate in the approximate amount of $2,017,780 dollars. Those payments were deposited into Compassionate's Bank of America accounts.

20.  As a result of these fraudulent claims, Medicare made payments to Madonna in the approximate amount of $462,202 dollars. Those payments were deposited into Madonna's Chase Bank accounts.

21.  As a result of these fraudulent claims, Medicare made payments to Unlimited in the approximate amount of $1,431,072 dollars. Those payments were deposited into Unlimited's Wells Fargo's Bank accounts.

22.  As a result of these fraudulent claims, Medicare made payments to Victorian in the approximate amount of $6,382,347 dollars. Those payments were deposited into Victorian's Wells Fargo Bank accounts.

23.  From in or around May 2006 through October 2020, Medicare paid the collective Home Health Agencies approximately $27,643,422 million dollars for home health services that were not necessary, for services not provided, and for services certified by a physician for beneficiaries not under the care of the physician.

24.  **ARISE** and other oconspirators both known and unknown used proceeds of the Medicare fraud to pay unlawful kickbacks, pay other operating expenses, and enrich themselves.

All in violation of Title 18, United States Code, Section 371.

## CRIMINAL FORFEITURE
## (18 U.S.C. § 982(a)(7))

Pursuant to Title 18, United States Code, Section 982(a)(7), the United States of America gives notice to **MARGARET ARISE** that upon conviction, all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such offense is subject to forfeiture.

### Money Judgment

Defendant **MARGARET ARISE** is notified that upon conviction, a money judgment may be imposed equal to the total value of the property subject to forfeiture, which approximately $27,800,846 millon dollars.

### Substitute Assets

**MARGARET ARISE** is notified that if any of the forfeitable property, or any portion thereof, as a result of any act or omission of Defendants or their co-conspirators:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred, or sold to, or deposited with a third party;

    c.    has been placed beyond the jurisdiction of the Court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States to seek forfeiture of any other property of defendants up to the total value of the property subject to forfeiture, pursuant to Title 21, United States Code, Section

853(p), incorporated by reference in Title 18, United States Code, Section 982(b)(1).

                                            JENNIFER LOWERY
                                            UNITED STATES ATTORNEY

                                            */s/ Tina Ansari*
                                            TINA ANSARI
                                            ASSISTANT UNITED STATES ATTORNEY